# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs July 23, 2014

## HOWARD G. BRUFF v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Cumberland County**
**No. 8244    Leon Burns, Jr., Judge**

---

**No. E2013-02223-CCA-R3-PC - Filed December 10, 2014**

---

The petitioner, Howard G. Bruff, appeals the Cumberland County Criminal Court's denial of his timely petition for post-conviction relief, which petition challenged his 2005 convictions of first degree murder and especially aggravated robbery on the grounds that his trial counsel was ineffective. Because the record supports the decision of the post-conviction court, we affirm that court's order.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., and JOE H. WALKER, III, SP. J., joined.

Howard G. Bruff, Wartburg, Tennessee, pro se.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Randall A. York, District Attorney General; and Gary McKenzie, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The evidence at the petitioner's jury trial revealed that on March 31, 2004, the victim, Kevin Hixson, was discovered murdered inside his home. *State v. Howard Gailand Bruff*, No. E2006-01070-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., Knoxville, Mar. 2, 2007), *perm. app. denied* (Tenn. Aug. 13, 2007). On the afternoon of March 29 between 1:30 and 2:00, neighbor Pat Williams observed a brown, rusty pick-up truck pull into the victim's driveway, and she saw the man driving the truck enter the victim's house. *Id.*, slip op. at 3. Approximately 20 to 30 minutes later, the neighbor witnessed the man leave the victim's house and drive away rapidly. *Id.* The victim's cellular telephone records revealed that the petitioner called the victim at 2:04 p.m. on March 29 and that the last call placed

from the victim's telephone was at 2:21 p.m. on that same date. *Id.*, slip op. at 5-6. However, neighbor Joan Poisson testified that she saw the victim on March 29 between 4:30 and 5:00 p.m., when he walked to his mailbox to check his mail. *Id.*, slip op. at 7. Ms. Poisson was certain of the time "because that was the time that she started making supper for her husband, who ate at the same time every day." *Id.* Ms. Poisson admitted that she was blind in one eye but insisted that it "did not prevent her from being able to see the victim." *Id.* Although Ms. Poisson had seen a "rusty Ford pick-up truck" at the victim's home on other days, she did not see the truck on March 29. *Id.*

The medical examiner determined that the victim had been shot twice in the head. *Id.* The first wound was to the back of the victim's head, and the second was to his left temple from close range. *Id.* Investigators believed that the victim was working on his satellite television connection when he was initially shot, causing him to fall in the living room corner, and that the victim was then moved before sustaining the second gunshot wound. *Id.*, slip op. at 2, 6. Daren Houston, a close friend of the victim, testified that the victim "commonly kept cash in his billfold in his front pants pocket" and that the victim "always had a couple hundred dollars in his possession." *Id.*, slip op. at 4. Investigators suspected that the victim had been robbed because the left front pocket of his shorts had been pulled out, and neither money nor a wallet was found on his person. *Id.*, slip op. at 2, 5. Investigators did, however, find a canister under the kitchen sink which contained $317. *Id.*, slip op. at 5.

Tennessee Bureau of Investigation ("TBI") Special Agent and Forensic Scientist Charles Hardy swabbed the pockets of the victim's shorts and testified that the major contributor of the deoxyribonucleic acid ("DNA") found on the pockets "matched the [petitioner] and that he could not exclude the victim as the minor contributor of the DNA." *Id.*, slip op. at 6-7. Special Agent Hardy explained that "DNA could be transferred from a person's hand to a pocket through loose skin cells that are released while the hand is being placed in and pulled out of the pocket." *Id.*, slip op. at 7. Special Agent Hardy opined that, given the amount of DNA found, the major contributor "was the last person to leave skin cells inside the pockets." *Id.* Special Agent Dan Royse testified that "the two bullet fragments recovered from the victim's head and the floor of the victim's house" were fired "from the same .32 caliber automatic gun." *Id.*

The petitioner testified that the victim, with whom he had been a friend, stopped by the petitioner's house in late March 2004 and asked for a change of clothes; according to the petitioner, the victim had spilled beer on his clothes and was worried that officers would smell the beer if he happened to get stopped while driving home. *Id.*, slip op. at 9. The victim changed and "left his soiled clothes, which included a pair of denim shorts, at the [petitioner]'s house." *Id.* After the petitioner had washed the victim's clothes, the

-2-

victim contacted him and asked the petitioner "to retrieve a piece of paper on which a lady's telephone number was written from a pocket of his shorts." *Id.* The petitioner checked the pockets of the victim's shorts but found the paper to be "illegible" after having been laundered. *Id.*

The petitioner testified that "he did not kill the victim" and that he had visited the victim on Sunday, March 28, to return the victim's shorts and to work on the victim's satellite system. *Id.* Shortly after the petitioner arrived, the victim "received a telephone call, said he could not work that day, and asked the [petitioner] to leave." *Id.* On the morning of March 29, 2004, the petitioner visited the home of Deborah Bruff to "discuss their relationship."[1] *Id.*, slip op. at 8. At 1:30, Mrs. Bruff instructed the petitioner to leave, which the petitioner did but then returned a few minutes later to retrieve a book before leaving again. *Id.*, slip op. at 8, 9. According to the petitioner, he contacted the victim at 2:04 p.m. in an attempt to purchase cocaine, but "he was unable to get cocaine from the victim." *Id.*, slip op. at 9. The petitioner then testified that he returned to his home and slept. *Id.* At around 4:00 p.m., the petitioner returned to Mrs. Bruff's home, apologized for upsetting her, and, according to Mrs. Bruff, told her "he would be leaving and would not bother her anymore." *Id.*, slip op. at 8.

Early on the morning of March 30, the petitioner arrived at the Starwood Market and, using a $100 bill, paid owner Terry Amonette $40 on the petitioner's charge account. *Id.*, slip op. at 4. According to Mr. Amonette, it appeared that the petitioner "had a few hundred dollars in his pocket." *Id.* The petitioner asked Mr. Amonette if he could borrow one of his vehicles so he could "visit his dying mother in Michigan." *Id.* Initially, Mr. Amonette agreed, and he and the petitioner drove to a local auto parts store. *Id.* While en route, the petitioner acted "jittery" and asked Mr. Amonette to tell anyone who asked that he had been at the Starwood Market on March 29. *Id.* The petitioner also remarked that "that son of a bitch might be dead," and, in response to Mr. Amonette's inquiry about the meaning of that statement, the petitioner replied, "Well you're just better off not to know." *Id.* Mr. Amonette then changed his mind and told the petitioner that he could not borrow a vehicle. *Id.* Mr. Amonette did, however, permit the petitioner to leave his truck at the Market. *Id.*, slip op. at 5.

On April 5, the petitioner contacted his friend, Teresa Stallings, and asked her to photograph him, a request the petitioner had never made on any prior occasion. *Id.* When Ms. Stallings arrived at the petitioner's house, she noticed that the petitioner had changed his hair color; the petitioner testified that he had dyed his hair to cover his grey hair and not because he was attempting to disguise himself. *Id.*, slip op. at 5, 10. When Ms. Stallings

---

[1]The petitioner and Mrs. Bruff married on May 5, 2004.

mentioned the victim's death to the petitioner, the petitioner claimed he had not heard the news. *Id.*, slip op. at 5. The petitioner "appeared upset for a few minutes" and told Ms. Stallings that he and the victim "were good friends." *Id.* The petitioner, however, then quickly recovered and turned his attention to the photograph, which Ms. Stallings found odd. *Id.*

The petitioner testified that, after Ms. Stallings took the photographs of him, he went to a local drug store to have the film developed. *Id.*, slip op. at 10. While at the store, he encountered a woman whose name he could not recall who informed him that the victim had been shot in the back of the head. *Id.* Later that day, Mrs. Bruff drove the petitioner to the bus station, and, while discussing the victim's death, the petitioner "mentioned that he found out one of his friends had been shot in the back of the head and killed." *Id.*, slip op. at 8. The petitioner visited his mother in Michigan for a few days before returning home. *Id.*, slip op. at 9. The petitioner's mother, Frances Woodring, testified that she had sent checks and money orders to the petitioner in March 2004 totaling $2600, an amount confirmed by the petitioner in his testimony. *Id.*, slip op. at 8-9, 10.

On April 8, Mrs. Bruff spoke with detectives and stated that the petitioner "was 'in a frenzy and mad rush' when he returned to her house at 4:00 p.m. on March 29." *Id.*, slip op. at 8. Mrs. Bruff also "acknowledged a signed statement in which she said that in her opinion the [petitioner] was 'a pathological liar' and that the [petitioner] once told her he had a gun and 'would brag that he could always get out of trouble.'" *Id.* On cross-examination, the petitioner "admitted that he had a habit of lying but said he was not lying at trial." *Id.*, slip op. at 10.

On rebuttal, Agent Calahan testified that he learned of the gunshot wound to the back of the victim's head on April 1; that only three or four investigators were aware of the specifics of the victim's wounds; that no "road deputies" were aware of the wounds; and that a local newspaper article released on April 6 stated "that the victim was shot at least once in the head" but that the article "did not state that the victim was shot in the back of the head." *Id.*, slip op. at 11. The petitioner was arrested in September 2004. *Id.*, slip op. at 10.

A Cumberland County Criminal Court jury convicted the petitioner of first degree premeditated murder, felony murder, and especially aggravated robbery. The trial court merged the two murder convictions and imposed concurrent sentences of life and 25 years' incarceration. This court affirmed the judgments on direct appeal. *See id.*, slip op. at 1.

On May 5, 2008, the petitioner filed, pro se, a petition for post-conviction relief. Following the appointment of counsel and the amendment of the petition, the post-

conviction court held an evidentiary hearing over the course of four separate dates between July 27, 2012 and March 22, 2013. On September 12, 2012, the second date of the hearing, the trial court granted the petitioner's request to relieve post-conviction counsel and allow the petitioner to proceed pro se, although the trial court re-appointed post-conviction counsel to serve as elbow counsel to the petitioner at the third hearing on October 26, 2012. Numerous witnesses testified over the course of the four days, and we will address the testimony that is pertinent to the issues raised in this appeal.

Sherri Gregory testified that the petitioner had performed framing work for her husband, a general contractor, who had passed away in 2008. Mrs. Gregory stated that she had testified on behalf of the petitioner at his bond reduction hearing and that she would have been available to testify at the petitioner's trial but that neither trial counsel nor anyone else interviewed her or approached her about testifying. Mrs. Gregory testified that, while the petitioner was employed by her husband, the petitioner had access to credit accounts at local supply stores, that he had borrowed money from the Gregorys on occasion, and that he had never abused those privileges. On cross-examination, Mrs. Gregory admitted that she had no knowledge of the petitioner's whereabouts on March 29, 2004, or any events that transpired on that date. Mrs. Gregory acknowledged that both she and her husband would have been able to testify only to the petitioner's employment, and Mrs. Gregory was unaware of the petitioner's drug usage.

Brenda Trent, one of the victim's neighbors, testified that, on March 29, 2004, her shift ended at McDonald's at 2:00 p.m. and that she arrived at her home approximately 10 minutes later. Ms. Trent was sitting on her swing set outside her house when she saw the victim. Ms. Trent also saw the petitioner arrive at the victim's house on March 29, and she initially testified that she saw the victim alive after the petitioner had left the victim's house. On cross-examination, however, Ms. Trent admitted that, in a prior statement she gave to the petitioner's investigator, she did not mention having seen the victim alive after the petitioner had departed on March 29. Ms. Trent acknowledged that her memory of the events would have been better when she gave the statement to the investigator.

William Joseph Watson, who was formerly employed by a DNA testing laboratory, Orchid Cellmark, testified that he had been contacted by a member of the defense team at some point prior to trial as a potential expert for the defense. Mr. Watson recalled that he had been asked to consider possible explanations for the petitioner's DNA profile on the victim's pockets:

> Without going into specifics, I couldn't say specifically how
> something could have transferred, but certainly the question
> was, is it possible that your DNA could have transferred to that

clothing through means other than you coming into direct contact with it? And, you know, it's certainly possible. You get into the area, is it likely versus is it possible? And that's one of those things, without more information specifically about the scene, I can't say. It is possible to get your DNA on a surface without you coming into contact with that surface. In – in this case, the amount of DNA that was found on the swab, again, would – would probably be more consistent with direct contact, but you couldn't say that definitively. It could certainly have transferred there through some other means.

Mr. Watson testified that it was his understanding that the TBI crime laboratory had used only one swab to collect DNA from all four pockets of the victim's shorts and that DNA could have been transferred from one pocket to another. In response to the petitioner's inquiry of whether the single swab method would have destroyed evidence for future testing, Mr. Watson responded that the evidence "could still be tested" but that "[t]he only thing you could say for sure is that DNA that matched your DNA was found on those shorts." Mr. Watson opined that the proper method for collection of DNA in this instance "would be to collect it with separate swabs, because you're treating each pocket like a separate site or a separate location."

TBI Special Agent Dan Royse testified that the petitioner's trial counsel never contacted him prior to trial to inquire whether two gunshots from a .32-caliber automatic handgun could have been heard by someone at a distance of 30 feet from the victim's home. Special Agent Royse stated that he would "have no way of knowing whether [the gunshots] could be heard outside, honestly."

TBI Special Agent Charles Hardy testified that his testing of the victim's shorts was the first occasion on which he had tested for "pocket DNA." Special Agent Hardy explained that there was no "established written protocol for every type of examination that we do" and that the protocol is "kind of left up to [the] analyst's discretion." Believing it would be best to "maximize [his] return," Special Agent Hardy chose to use one swab to test all four pockets. He acknowledged that, due to improvements in instrumentation and chemistry, the TBI now typically swabs each pocket individually. Special Agent Hardy stated that he felt confident that the pockets could have been tested again by an expert for the defense and that, although the amount of DNA recovered would likely have been less, the results would not have differed greatly from his own results. Special Agent Hardy confirmed that only two DNA profiles were present on the pockets: the minor contributor was the victim, and the major contributor was the petitioner.

Trial counsel testified that he had been appointed to represent the petitioner at trial. With respect to the petitioner's claims that trial counsel should have filed a motion to suppress the DNA evidence, trial counsel testified that he did not believe such a motion would have been successful because "the DNA was admissible under the rules of evidence." Trial counsel stated that he had petitioned for, and was granted, funds to hire a DNA expert and that the expert he consulted had opined that the DNA testing "was all on the up and up." Although trial counsel conceded that the TBI's process of testing all four pockets with a single swab was questionable, it did nothing to change the fact that the petitioner's DNA was discovered in the victim's pockets.

Trial counsel explained that a local, prominent businessman, Mike Stone, had been angry with the victim and that, at trial, counsel had referenced "a local businessman who might have been involved" in the victim's murder. Trial counsel explained that he chose not to use Mr. Stone's name at trial not because he was intimidated by Mr. Stone's prominence in the community but rather because he believed "the jury might be more willing to assume that some shady, unknown, unnamed businessman might have been involved." Trial counsel also chose not to call Mr. Stone as a witness at trial because he knew Mr. Stone would have denied taking part in the murder, and counsel was afraid the jury would view placing this well-respected man on the witness stand as a "desperate act."

With respect to the petitioner's claim that trial counsel had failed to introduce receipts of money orders sent to the petitioner from his mother, counsel admitted that he had lost the receipts; however, he believed the loss of the receipts was mitigated by the trial testimony of the petitioner's mother that she had actually mailed the money to the petitioner. In response to questioning on why trial counsel did not call Ms. Brenda Trent as a witness at trial, counsel explained that Ms. Trent's testimony that she had seen "the victim and the [petitioner] together discussing money" in the early afternoon hours of March 29 would have aligned more closely with the State's theory of the case and would have directly contradicted the testimony of Ms. Poisson, who testified at trial that she had seen the victim alive between 4:30 and 5:00 p.m. on March 29.

Trial counsel testified that he had informed the petitioner that "it was important for the jury to hear this DNA evidence, alternative theory" of how the petitioner's DNA was found in the victim's pockets and that he had explained that "the jury wouldn't hear it if [the petitioner] didn't tell them." Trial counsel denied that he had forced the petitioner to testify and stated that he informed the petitioner that "it was his choice."

Trial counsel addressed the reasoning behind his decision not to call Mr. and Mrs. Gregory as witnesses at trial, explaining that the petitioner's "character wasn't on trial at the time, and [the Gregorys] were not fully apprised of his character." Trial counsel

continued, stating that

> [the Gregorys] didn't know that he had a gun that he carried sometimes; they didn't know that he spent a lot of money on cocaine. They could have testified they loaned him money, but somebody killed [the victim] and took his money. It would have supported the opinion that [the petitioner] didn't have money of his own; he was borrowing from his mom and borrowing from his employer. So, I just didn't think it was going to be particularly fruitful to have them come and say, "We know [the petitioner], and we think he's a good guy," and then by the time they get off the witness stand, they've been proved to be not knowing what they were talking about.

The post-conviction court made extensive findings of fact and conclusions of law in its August 30, 2013 order denying post-conviction relief, addressing each of the petitioner's 25 "arguments" of ineffective assistance of counsel. The post-conviction court concluded that the petitioner

> has at best pointed out areas where trial counsel could have and maybe should have done a better job. But there has been no proof presented to prove by clear and convincing evidence that trial counsel was "not functioning as counsel guaranteed by the Sixth Amendment." Nor has there been proof presented in this court's opinion that petitioner was prejudiced by counsel's representation.

In this appeal, the petitioner reiterates many of his claims of ineffective assistance of counsel and, in addition, presents a claim of actual innocence. Before reaching the petitioner's issues on appeal, however, we must address the petitioner's failure to timely file his notice of appeal. In its brief before this court, the State correctly notes that the petitioner's October 1, 2013 notice of appeal from the order dismissing his post-conviction petition was not filed within 30 days of the entry of the challenged judgment and is therefore untimely. *See* Tenn. R. App. P. 4(a). Although the notice of appeal is signed and dated by the petitioner on September 27, 2013, nothing indicates the date on which the document was presented to prison officials for mailing, as is required by the "mailbox rule." *See* Tenn. R. Crim. P. 49(d)(1), (3) (stating that a filing will be deemed timely if the papers were delivered to the appropriate individual at the correctional facility where the pro se litigant is incarcerated within the time fixed for filing and placing the burden on the pro se litigant of proving compliance with this provision). However, in view of the petitioner's status as an

incarcerated, pro se litigant, we will waive the timely filing requirement in the interest of justice. *See* Tenn. R. App. P. 4(a).

Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Strickland*, 466 U.S. at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are mixed questions of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the

application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

With these principles in mind, we address the petitioner's issues.

*DNA Evidence*

The petitioner raises a number of issues that pertain to the DNA evidence admitted at trial. First, the petitioner contends that trial counsel was ineffective by failing to file either a motion to suppress or a motion in limine to prevent the State from introducing into evidence the results of the DNA testing. The petitioner argues that Special Agent Hardy's method of testing all four pockets with a single swab compromised the evidence and that therefore the evidence should have been suppressed. When questioned about the DNA evidence at the post-conviction hearing, trial counsel stated that it was his belief that a motion to suppress or otherwise exclude the results of the DNA testing would have been unsuccessful because "the DNA was admissible under the rules of evidence" and that this decision was made after consultation with DNA expert, William Watson. This tactical decision cannot avail the petitioner of the relief he seeks. *See Adkins*, 911 S.W.2d at 347. Similarly, the petitioner's claim that trial counsel was ineffective for failing to object to the admission of the DNA evidence at trial fails for the same reason: if trial counsel determined, after appropriate preparation, that no basis existed to suppress the DNA evidence, trial counsel had no reason to object to its admission at trial. *See id.*

The petitioner argues that trial counsel was ineffective by failing to conduct an adequate cross-examination of Special Agent Hardy at trial. The petitioner appears to contend that trial counsel should have questioned Special Agent Hardy more extensively regarding the fact that he had never before conducted a test for "pocket DNA" and that he used only one swab to test all four pockets of the victim's shorts. We find this argument unpersuasive. That Special Agent Hardy conducted this type of DNA testing for the first time and used only one swab on all four pockets does nothing to alter the fact that a significant amount of the petitioner's DNA was found on *at least one* of those pockets. We fail to see how more rigorous questioning of Special Agent Hardy would have resulted in a different outcome for the petitioner. *See Strickland*, 466 U.S. at 694.

The petitioner next contends that Agent Calahan "intentionally instructed the [TBI] crime lab to compromise and destroy exculpatory DNA evidence" and that trial counsel was ineffective for failing to pursue a destruction of evidence claim pursuant to *State v. Ferguson*, 2 S.W.3d 912 (1999). The petitioner has presented absolutely no proof to support his contention of destruction of evidence, and it therefore follows that he failed to

-10-

prove that trial counsel was ineffective for failing to pursue such a claim.

Finally, the petitioner argues that trial counsel was ineffective for failing "to verify the information found in the DNA expert's report and fail[ing] to get an independent expert to refute the unverified reports." At the post-conviction evidentiary hearing, the petitioner questioned William Joseph Watson, who confirmed that he had been contacted by either trial counsel or trial counsel's investigator to potentially testify on the petitioner's behalf. Mr. Watson stated that it was "certainly possible" that the petitioner's DNA could have been transferred to the victim's pockets without the petitioner's having come into contact with the pockets, but Mr. Watson testified that the "amount of DNA that was found on the swab . . . would probably be more consistent with direct contact." Mr. Watson also testified that "[t]he only thing you could say for sure is that DNA that matched [the petitioner's] DNA was found on those shorts." Trial counsel testified that, although Special Agent Hardy's testing method was questionable, it did not alter the fact that the petitioner's DNA was present on the victim's pockets. We will not second-guess trial counsel's decision to not use Mr. Watson's testimony at trial, *see Adkins*, 911 S.W.2d at 347, and the petitioner has failed to prove either deficient performance or prejudice with respect to the DNA evidence, *see Strickland*, 466 U.S. at 697.

*Witness Brenda Trent*

Next, the petitioner contends that trial counsel was ineffective by failing to call Ms. Trent as a witness at trial. The petitioner erroneously argues that Ms. Trent's testimony at the post-conviction hearing "unequivocally establishes that the victim was seen alive at around 5:00 p.m. which was several hours after the State alleged [the petitioner] had killed the victim." To the contrary, Ms. Trent's testimony at the hearing shows, *at best*, that she saw the victim alive sometime after 2:00 p.m. on March 29, which is consistent with the State's timeline of events. Moreover, the petitioner is incorrect in his assertion that "no one ever spoke to Brenda Trent prior to trial about when she saw the victim alive on the day of the homicide." Although it was unclear from Ms. Trent's testimony whether it was trial counsel or counsel's investigator who spoke to her prior to trial, she agreed that she gave a statement and looked at photographs brought to her by one of those two men. Trial counsel testified at the post-conviction hearing that he chose not to call Ms. Trent because her testimony would have been detrimental to the defense. Instead, trial counsel called neighbor Joan Poisson to testify at trial, and Ms. Poisson was adamant that she had seen the victim alive on March 29 between 4:30 and 5:00 p.m. Clearly, Ms. Poisson's testimony was more favorable for the defense, and the petitioner has shown no ineffectiveness in trial counsel's decision to not call Ms. Trent as a witness at trial.

-11-

*Money Order Receipts*

Next, the petitioner contends that trial counsel was ineffective by failing to preserve the original receipts of the $2600 money orders the petitioner's received from his mother in March 2004. The petitioner also contends that trial counsel should have introduced copies of the receipts. Although trial counsel admitted at the post-conviction hearing that he had lost the receipts, he opined that the trial testimony of the petitioner's mother that she had actually sent the $2600 to the petitioner was sufficient. As noted by the post-conviction court, the money orders receipts would certainly have "bolstered" Ms. Woodring's testimony, but the petitioner has failed to demonstrate how entry of the receipts at trial would have in any way altered the outcome of his case. *See Strickland*, 466 U.S. at 694.

*"Third Party Guilt Defense"*

The petitioner asserts that trial counsel failed to present "a third party guilt defense at his trial," contending that trial counsel should have more rigorously pursued the theory that a local businessman, Mike Stone, killed the victim. At the post-conviction hearing, trial counsel testified that he was aware that Mr. Stone had made angry telephone calls to the victim prior to his death. Trial counsel stated that he chose not to use Mr. Stone's name at trial but decided instead to reference "a local businessman who might have been involved" in the victim's murder. Trial counsel believed that the jury might be more apt to "assume that some shady, unknown, unnamed businessman" might have committed the murder rather than using Mr. Stone's name and asking the jury to believe that a prominent, well-known member of the community had murdered the victim. Trial counsel also testified that he did not call Mr. Stone as a witness at trial because he knew Mr. Stone "would have denied any part in the killing" and the jury might have seen it "as a desperate act." Again, we will not second-guess this reasonable trial strategy. *See Adkins*, 911 S.W.2d 334.

*Petitioner's Trial Testimony*

Next, the petitioner argues that trial counsel "insisted," against the petitioner's wishes, that the petitioner testify at trial, failed to adequately prepare the petitioner to testify, and failed to warn the petitioner of the disadvantages inherent in taking the witness stand. At the post-conviction evidentiary hearing, trial counsel testified – and the post-conviction court accredited his testimony – that he had explained to the petitioner that the jury needed to hear his version of how his DNA ended up in the victim's pockets and that he was the only person who could provide that explanation. Trial counsel denied forcing the petitioner to testify and told the petitioner that the decision to testify was his choice. Trial counsel also stated that he and his investigator had prepared the petitioner for trial by conducting a mock trial. The petitioner has failed to establish either deficient performance or prejudice in this

regard.  *See Strickland*, 466 U.S. at 697; *Goad*, 938 S.W.2d at 370.

*Witness Sherri Gregory*

The petitioner next contends that trial counsel was ineffective by failing to call Sherri Gregory, the wife of his former employer, as a witness at trial to vouch for the petitioner's "character for truthfulness and trustworthiness." At the post-conviction hearing, trial counsel explained that he chose not to call Mrs. Gregory as a witness at trial because she was unaware that the petitioner possessed a handgun or that the petitioner used drugs, information which would have severely undercut her testimony that the petitioner was "a good guy." Moreover, trial counsel believed that having Mrs. Gregory testify about loaning money to the petitioner, coupled with testimony that the petitioner had recently received $2600 from his mother, would have supported the State's theory that the petitioner murdered and robbed the victim for money. The petitioner has failed to demonstrate that the failure to call Mrs. Gregory as a witness adversely impacted his defense. *See Strickland*, 466 U.S. at 693.

*Ballistics Expert*

The petitioner asserts that trial counsel was ineffective by failing to hire a ballistics expert who "would have been able to testify that if a witness could hear an automobile throwing gravel in the victim's driveway, then that same witness should have also heard the .32 caliber weapon fire twice just before hearing the throwing of gravel in the victim's drive way." When the petitioner questioned Special Agent Royse at the post-conviction hearing concerning the sound of gunfire from a .32-caliber weapon, Special Agent Royse replied that he would "have no way of knowing whether [the gunshots] could be heard outside, honestly." The petitioner presented absolutely no proof to support this tenuous theory, and thus, he has failed to prove ineffectiveness.

*Prosecutorial Misconduct*

Next, the petitioner makes a very brief argument that trial counsel was ineffective "for not addressing a vast number of instances of prosecutorial misconduct by way of requesting a mistrial or alternatively requesting a curative jury instruction." The petitioner contends that these issues "concern a number of instances where the prosecutor vouched for the credibility of prosecution witnesses; inflammatory statements and misstatements of facts during voir dire; and made numerous misstatements of facts during closing arguments." The petitioner does not further expound upon these numerous instances of misconduct, citing instead to the pages of his original and amended petitions for post-conviction relief wherein he addresses the issue of prosecutorial misconduct. Aside from a

cursory citation to *Strickland*, the petitioner provides no citation to authority, nor does he support his contention with argument or citation to the record of the post-conviction hearing. Because the petitioner has made only conclusory statements and a cursory citation to authority, he has waived our consideration of this issue for failure to cite to *adequate* authority, to present an *adequate* argument, or to provide *appropriate* references to the record. *See* Tenn. Ct. Crim. App. R. 10(b).

*Proof of Serious Bodily Injury*

The petitioner contends that trial counsel was ineffective by failing to "move for a judgment of acquittal and/or challenge the sufficiency of the evidence on the basis of the prosecution's failure to prove the more essential element of serious bodily injury for an especially aggravated robbery conviction and felony murder based upon said especially aggravated robbery as the underlying felony." In addressing this issue, the post-conviction court made the following findings:

> Serious bodily injury includes in part: (a) substantial risk of death; (b) protracted unconscientiousness; (c) extreme physical pain; (d) protracted or obvious disfigurement; (e) protracted loss or substantial impairment of a function of a bodily member[,] organ or mental faculty; . . . . T.C.A. § 39-11-106(34). The victim was shot in the head twice. The proof would suggest that the first shot was to the back right of the head. At trial the medical examiner was asked what that shot would have done to the victim. His reply, according to the petitioner's reference to the trial transcript in his petition was, "it would cause multiple skull fractures, the bone fracture and it would impair the body and potentially it's fatal." This court finds that the testimony of the medical examiner is sufficient to prove serious bodily injury. In the court's opinion, the first shot to the head created a substantial risk of death, caused extreme physical pain, caused an obvious disfigurement as well as a substantial impairment of a bodily organ. The court also finds that had counsel challenged the issue on a motion for judgment of acquittal or on appeal on sufficiency of the evidence, he would not have been successful. Petitioner has not shown ineffectiveness or prejudice on this issue.

We find the post-conviction court's reasoning sound, and we conclude that the petitioner has failed to demonstrate that the lack of a motion for judgment of acquittal or a challenge to the

-14-

sufficiency of the evidence on this basis inured to his prejudice.

*Cumulative Error*

In his final argument relating to the ineffectiveness of trial counsel, the petitioner contends that the cumulative effect of the errors of trial counsel prejudiced his defense. Having considered each of the petitioner's issues on appeal and concluded that he is not entitled to relief for any, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

*Evidentiary Sufficiency*

In a separate issue, the petitioner contends that he is "actually innocent" and entitled to appropriate relief. Because the petitioner, in addressing this issue, merely revisits the evidence presented at trial, we perceive his issue to be a challenge to the sufficiency of the evidence. "The law is settled beyond question that . . . post-conviction proceedings may not be employed" to "question the sufficiency of the evidence." *Gant v. State*, 507 S.W.2d 133, 136 (Tenn. Crim. App. 1973). Thus, the petitioner is entitled to no relief.

*Conclusion*

We find no error in the findings of the trial court, and we hold the petitioner has failed to prove by clear and convincing evidence that trial counsel's representation was deficient or prejudicial. Accordingly, the order of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-15-